SOMMERS v. CARBON HILL COAL CO.

(Circuit Court, D. Washington, W. D. December 28, 1898.)

1. NEW TRIAL—SURPRISE.

The mere fact that a party was surprised by the testimony of a witness is not ground for a new trial, but it must also be shown that its effect was to deprive him of a fair trial: and where he was advised that the witness would not testify as he expected, and, in consequence, declined to call him, leaving the opposite party to do so, there is no ground for supposing the testimony would be less prejudicial on another trial.

2. TRIAL—INSTRUCTIONS—COMMENTING ON THE TESTIMONY.

A provision of a state constitution that judges, in instructing juries, shall not comment on the evidence, is not applicable as a rule of practice in a federal court, and in such court it is proper for the judge to comment fairly and impartially on the testimony, for the purpose of more clearly defining the issues submitted, and of assisting the jury in reaching a just conclusion.

3. MASTER AND SERVANT—ACTION FOR PERSONAL INJURY—SUFFICIENCY OF EVIDENCE.

Plaintiff, a coal miner, in an action against the owner of the mine in which he worked to recover for injuries alleged to have resulted from an explosion of gas following his striking a match to light a fuse, testified that he tested the locality 15 minutes before, and it was clear of gas, and also that the presence of gas in sufficient quantity to cause the explosion would have been indicated by the flame of his lamp. *Held*, that a verdict for defendant would not be disturbed, as the facts stated did not indicate that it negligently permitted the accumulation of standing gas, as alleged, but were only consistent with the theory that the gas suddenly escaped from some part of the surrounding wall, and that the negligence, if any, was on the part of plaintiff in not observing his lamp immediately before striking the match.

This case has been argued and submitted upon a motion by the plaintiff for a new trial.

The action is to recover damages for a personal injury suffered by the plaintiff while working in the defendant's coal mine. The substantial part of the plaintiff's charge against the defendant, as stated in his original complaint, is as follows: "That at about the time of the accident complained of the plaintiff was working at the face of chute No. 2, which was about 45 feet above the second crosscut. That a short time before said accident he noticed gas accumulating at the said working place, at the face of chute No. 2. That the accumulation of gas was due and owing to insufficient ventilation at the working place, and the lack of ventilation at the working place and face of the chute was due and owing to the negligence and carelessness of the fire boss, John Lowrey, and the defendant company, in this: (1) That John Lowrey fixed, managed, and arranged the canvas gate in crosscut No. 1 so as to leave a wide space or opening, through which a great volume of the air provided for ventilation would and did pass down and out of chute No. 2, and did not reach the face thereof, and an insufficient amount of air for ventilation was forced up chute No. 1 through the second crosscut to the working place in chute No. 2; and (2) in the defendant ordering and providing crosscuts at the distance of 40 feet apart, whereas they should not be more than 30 feet apart to insure ventilation and a sufficient amount of air at the face of the working places, as provided by law. That, soon after noticing the accumulation of gas, plaintiff complained to Lowrey that there was gas accumulating at the face of chute No. 2; and notified Lowrey that the accumulation was due to an insufficient amount of air at the face of the chute, and complained to Lowrey of the opening in the first crosscut, and requested Lowrey to furnish the working place with more and better ventilation; but that Lowrey, neglecting his duty in this respect, failed to fix and arrange the canvas gate in the first crosscut, and failed and neglected to furnish the working place in chute No. 2 with proper ventilation, and willfully and negligently allowed the gas to accumulate at the face of the chute in large quantities. That the plaintiff, in pursuance of his regular course of duty and employment, and thinking and believing that Lowrey had performed his duty according to law, and had freed the face of the chute from gas, proceeded to the face of the chute for the purpose of lighting and setting off a charge of giant powder by a fuse thereto attached. That, in his usual way and manner and practice in the mine, the plaintiff lighted a match for the purpose of lighting the fuse, but that, at the moment the match was lighted, the gas which had accumulated at the face of the chute through the carelessness and negligence of the defendant company exploded, throwing the plaintiff violently to the bottom of the chute, burning and mutilating the face and arms of the plaintiff, and burning and destroying both of the plaintiff's eyes, so that the same are beyond recovery, and the plaintiff will always remain blind during the remainder of his lifetime."

This court sustained a demurrer to this complaint on the ground that it was affirmatively shown therein that the negligence and wrong complained of were the negligence and wrong of a fellow servant of the plaintiff, for which the defendant is not legally liable to respond in damages; and it was affirmatively shown by said complaint that the plaintiff's own negligence was a contributing cause of his injury. Upon a writ of error the circuit court of appeals for the Ninth circuit reversed the judgment of this court upon said demurrer, and remanded the case here for trial (Sommer v. Coal Co., 32 C. C. A. 156, 89 Fed. 54), and, after the filing of an answer and reply, the case was tried before the court and a jury, resulting in a verdict in favor of the defendant. During the progress of the trial a second amended complaint was filed, in which the plaintiff deviated from his first statement by substituting in place of his former statement that he noticed the presence of gas at his working place in the chute, and that he reported the fact to the fire boss,—a statement to the effect that the plaintiff "noticed that the ventilation of said working place was not sufficient to clear the same from gas and smoke as quickly and readily as it should be made to do so for the safety required in such places in said mine; * * * that, soon after noticing the said lack of air and ventilation, this plaintiff complained to the said Lowrey that there was not enough air at the face of said chute No. 2, and notified said Lowrey that said lack of air and ventilation was due to the opening" in the canvas

gate, which is described substantially as in the former pleading; and on the part of plaintiff the trial was conducted upon the theory that the plaintiff did not, immediately preceding the accident, have actual knowledge of the presence of gas at his working place, nor report the presence of gas to the fire boss, but did know that the ventilation was not sufficient to keep the chute clear of gas and smoke. It is shown by other allegations in the second amended complaint that the plaintiff had worked in said mine for about eight years prior to the accident, and that there are great accumulations of natural gas in said mine, which has a tendency to fill the mine, making the operation of mining therein without a sufficient current of air to dissolve and expel the gas impossible, which the plaintiff well knew. On the trial, the plaintiff himself testified that he had worked in this particular mine about a year and a half prior to the accident, and knew the mine to be a gaseous mine. He also gave testimony as follows:

"A miner, when he works in a mine and comes by gas, he knows it by his lamp. He knows when he works in a mine when there is gas. I see by the flame in the lamp. It makes a little flame up and down,—that is, when there is gas there; that shows there is some gas. * * * A miner knows when he watch the flame of his lamp he sees a kind of blue in the flame, and the flame go up and down, then he knows there is gas. So when he watch for gas, he can see a kind of flame,—kind of blue flame,—the way I see in that chute pretty soon after I go in there, about fifteen feet up. Q. What kind of flame did you say you saw? A. Well, blue. When the flame is kind of blue then I know there is gas in there, and I must make that out before I go in there to work. When there is no gas in the working place, then he can't see no flame there by—what you call that?—that gauze on the lamp. * * * Q. What time did you reach your working place? A. I guess it was about half past seven. Q. Now, you may describe to the jury what you done from that time up to the time you had the explosion. A. Well, I go up from the gangway, right up to the second crosscut. I go up to the first crosscut first when I go from the gangway,—up to the first crosscut,—and then I go up to the first chute in the second crosscut. Then into the second chute, and go right up to my working place. So I go along the place there, and I see where the fire boss he has been around there, and make a mark,—that he has been around and put on the working places whether it has gas or not; and I see first that he has put his chalk mark around there that there is no gas, so I started to work. I dig a little bit, just so much as to make a place enough for to drill a hole, and I drilled the hole about four feet; and then I go down in the crosscut for to fetch some powder up and my fuse. So when I go down there I went up and around where I can see somebody in the gangway, and in the big crosscut, where I see John Lowrey. He asks me, 'How is it up there?' 'Well, I tell him, we need more air up there. Shut the canvas gate,—the hole in the canvas gate down in the crosscut. We got more gas down there.' He says, 'All right.' Well, I go up with my powder and fuse, and I fix my powder on the bottom, and then I take my lamp, and put it under the rip. I wanted to see if the powder is put in too little or all right in the rip. Then I take my lamp up, and put it all around to the top and to the bottom, so I can see if the air is enough, or if there is gas there. I don't find anything with my lamp there,—so I could see anything with my lamp there. I go up with my lamp all along from the rip there, and look for gas. I wanted to know if there is anything wrong there, and I don't find nothing of any gas; and I want to see that my powder he ain't falling down, or anything. So I take my powder and paper and I make about four packages, or cartridges, then I take powder and paper, and tamp in the hole. So, when I have already got the hole tamped, then I take my tools, and go down to the crosscut, and then I go up again. When I come up again, I take a match, and strike the match so [illustrating], and so soon I fire the match then there comes pouf! and I don't know anything more! That fire not burned coal dust, but come quick, like a shot, and strike me in the face, and all my arms and everywheres. When I find out anything more,—it must be some time from when I struck the match,—I am knocked down into the hole there. I don't know how long it is, and I yell. I don't know how long I have been down in that hole, but I hollow for help, and the fire boss run to me. John

Lowrey, he comes around where I was, and I say to him that I am burned. He said, 'Did you get hurt in an explosion?' I said, 'Yes, I am hurt in an explosion.' He picked me up, and he said: 'Where are you hurt? Can you see?' I said, 'No, I can't see.' He said, 'Which way you go?' I said: 'I don't know which way I come. Anyway, I know I am knocked down from my working place. I fired my shot. I lit my match to fire my shot, and I am knocked down there. I don't know where I am.' He says, 'You fall more than ninety feet down.' He said he will bring me up again, and he brings me up. All the time I can't see. I don't know what, anything. So when he bring me out, then he gets some coats, and I don't know,—I don't understand. All I know I tell him I want him to bring me up, and take me home,—bring me home; and he bring me home—some fellow—what's his name now? He tells him to bring me home, and that is all what I know. * * * Q. About how long was it after you spoke to Dave Hopkins that the gas exploded? Or to John Lowrey, I mean, instead of Dave Hopkins? How long was it after you spoke to John Lowrey that the gas exploded? A. Well, I think it was about fifteen minutes. It don't take long for to go down for the powder and tamp,—all ready for to tamp. I think it was about fifteen minutes, that was before that; yes."

And on cross-examination the plaintiff gave further testimony, as follows:

"Q. Do you understand the testing of gas with a safety lamp? A. The testing? Q. Yes. A. Well, when there is gas in the place, the gas is lighter than the air, so the gas will go all the time to the top of the place, to the roof; so when a man, he will take his lamp, and hold it up to the roof, just make a small flame in the lamp, and you go up to the roof, just turn the lamp down so there is just a little flame, and then you hold the lamp up to the roof, from one side to the other, and, if he sees the flame is moving up, well, there is gas there; and, if he cannot see, then it is clear there. * * * Q. Now, as I understand you, before you fired this shot you held your safety lamp up to this roof? A. Yes— Q. Now, wait a minute— A. I held my safety lamp up before I fired. When I make it so I shall fire the shot, before I tamp, when I go down from my place. Then when I go up again to see that there is no change in the place, so I make it I hold my lamp again to the roof, and I find that the blaze show that the air was clear. Q. Now, that was just before you put the dynamite cartridge into the hole? A. Yes, before I put it in. Q. Now, after you put the dynamite cartridge into the hole, you had nothing to do then except light your fuse, had you? A. Yes, sir; just a while before that—before I light the fuse—I go put the tools there, so when the shot will go off it will knock the coal down, and it will knock the tools down, too, so you have got to put the tools in a safe place. So I went and took the tools down to a safe place. The only safe place is down in the crosscut. I packed the tools down into the crosscut, and I come up again, and I was make a little bit of hole down, so. Then I strike the match. Q. How long did it take you to put your tools down into the crosscut and come back again to where you lit the match? A. I didn't take very long. Q. Well, how long? A. Well, may be it took about five minutes, I guess. I didn't watch that. I don't know exactly the time, but I never put so much time if I am at work at that kind of thing. Q. You don't know exactly when? Well, just your idea is all I want, Mr. Sommers. A. Well, about five minutes, I guess. Q. Well, did you light the match right away after you got back? A. Well, when I come back I light the match right away. * * * Q. Now, Mr. Sommers, did you make more than one test with your safety lamp this morning, on the morning that you were hurt? A. Yes, I make one test."

Among other instructions to the jury, the court gave the following:

"If it appears to you by a fair preponderance of the evidence that the plaintiff himself was guilty of contributory negligence, and that the negligence was a contributing cause to the injury, then you have no right to assume that the defendant company caused the injury, because, if both were negligent, and the negligence of both contributed to produce the injury, the law then shifts the responsibility, and lets the consequence fall upon the injured party. You must take into account what the evidence shows the facts to be as to the care which plaintiff himself exercised for his own safety,—whether or

not he used his safety lamp when he should have used it, or whether or not he watched for quantities of gas coming out into the mine so as to make it dangerous to light a match there, and if he failed to exercise proper caution in that regard. I leave it to you to determine whether or not that failure amounted to negligence, because what is negligence is all a question for the jury. If you find that the evidence shows that he did look for gas, and made a test with his safety lamp, and discovered that there was gas, then it is for you to say whether, under the circumstances, he exercised due care in endeavoring to have the place freed from gas before he lit the match,—whether he reported to any one that could take the proper steps necessary to drive the gas out before he lit the match. If he did make a report to Mr. Lowrey, or to any one else, whether he acted with due care in lighting the match before he had ascertained that his complaint had been acted upon."

G. Teats and Frederick A. Brown, for plaintiff.

James M. Ashton, for defendant.

HANFORD, District Judge (after stating the facts as above). The motion for a new trial specifies a number of grounds, but I deem it necessary to only refer to the following, which were especially urged in the argument: First. The plaintiff was surprised by the testimony given by Dr. Kibbe, a witness called by the defendant. Second. Error in the ruling of the court excluding evidence offered by the plaintiff in rebuttal. Third. Error in the instructions given by the court to the jury. Fourth. The plaintiff was prejudiced by comments made by the court upon the evidence when giving instructions to the jury.

In support of the plaintiff's claim that he was taken by surprise upon the trial, his attorneys have filed affidavits charging that Dr. Kibbe, a physician and specialist in the treatment of injuries and diseases of the eye, who was called upon by the plaintiff for treatment a few days after the injury, had given assurances to the affiants a short time previous to the trial that, if called as a witness in the case, he would testify that he examined the plaintiff five or seven days after the accident, and found him to be at that time totally blind; that the injury was the result of a burn; that the plaintiff was then suffering from a burn; that the burn was a gas explosion; that there was no fracture or break of the skin to indicate a shot, and that a shot would have bruised and broken the skin and flesh; and that the affiants depended upon Dr. Kibbe to prove that the injury to plaintiff was caused by burning gas, and not by any other explosion or shot, and that they had no ground for expecting other or different testimony from Dr. Kibbe until after the physical examination of the plaintiff by Dr. Kibbe and other doctors during the progress of the trial. In the argument one of the plaintiff's attorneys also made the statement that, if he had not depended upon the assurance received from Dr. Kibbe previous to the trial, he would not have consented to the examination of the plaintiff by the doctors during the trial. It is quite probable that the plaintiff's attorneys were surprised by the testimony of Dr. Kibbe and others who examined the plaintiff during the trial, but mere surprise is not a legal ground for setting aside the verdict of a jury, unless the party alleging surprise shows that its effect was to deprive him of a fair trial. In this case the plaintiff was not entrapped; he voluntarily consented to submit himself to a physical examination, and the examination was made by other physicians of his own selection as well as by Dr. Kibbe.

He was apprised of the result of the examination in its effect upon the opinions of the different doctors before they were called as witnesses, and in consequence of that information he did not make Dr. Kibbe his witness. Upon a new trial the examination which was made may be shown by the testimony of the witnesses to the fact, and the opinions of the same witnesses, based thereon, may be given in evidence. Facts which have come to the knowledge of witnesses cannot be suppressed, and, presumably, if the testimony of the doctors was prejudicial to the plaintiff upon the trial which has taken place, it will be equally prejudicial upon a second trial.

In his case in chief the plaintiff offered evidence in support of the allegations of his complaint as to the position and duty of John Lowrey, whom the complaint charges with negligence causing the injury. The defendant introduced evidence tending to prove that one of the written and permanent rules governing the operation of its coal mine in which the injury occurred forbids any person except the general underground superintendent to change, or in any way interfere with, the brattice or other arrangements for conducting air into the different crosscuts and chutes in the mine, and also offered testimony tending to prove that for the safety of the miners in different parts of the mine it is necessary that the arrangements for conducting and distributing air through the mine should be under the control of a single person, who must necessarily have knowledge of the requirements of the miners working in the different crosscuts and chutes; and that at the time of the injury to the plaintiff the only person who had a right to close an opening, or make any alteration in the brattice, was Mr. Evan Lewis, whose position was that of general underground boss or superintendent. The plaintiff, in rebuttal, called witnesses who have worked as miners in the mine where this injury occurred, and interrogated them as to the duty of a fire boss in said mine, and, upon an objection to these interrogatories being sustained by the court on the ground that the testimony called for was not proper in rebuttal, the plaintiff's attorneys were permitted to make an offer of evidence which they wished to introduce, and thereupon Mr. Teats, attorney for the plaintiff, made the offer as follows: "We offer to prove by this witness that it was the duty of John Lowrey, the fire boss, to arrange the canvas gate in the big crosscut when requested by Mr. Sommers, to give Mr. Sommers more air; that that was one of the duties of the fire boss of this mine;" and, an objection being made to the introduction of the testimony as offered, the court sustained the objection on the ground that the same was not proper in rebuttal. In the argument of this motion it is insisted that the plaintiff had the right in rebuttal to prove that the company's rule forbidding any person other than the general underground superintendent to interfere with the air passages was, in effect, annulled by the general practice of disregarding it. The manner in which the different officers and employés of the defendant actually operated this mine might show what were the duties assigned to them by their employer, but duties and practices are not necessarily identical, and the attorney should have informed the court at the time that he proposed to prove what the actual practice was, if, in fact, that purpose was in his mind. His exception will not avail to give him the benefit of an

afterthought.   It is useless to discuss the question as to the right of the plaintiff to prove in rebuttal that there had been habitual disregard of one of the standing rules governing the operation of the mine, because no evidence tending to prove any such practice was, in fact, offered or suggested upon the trial; and for that reason alone I hold that the plaintiff's contention on this point is without merit.

The part of the instructions to which exceptions were noted was given in an endeavor by the court to particularly define the issues, and to point out to the jury the disputed questions, which must necessarily be decided by the jury; and the whole matter as to what the evidence proved, as to the manner in which the accident occurred, and as to the plaintiff's conduct, and whether the plaintiff was, by reason of any act or omission of his own, guilty of negligence which contributed to cause the injury to himself, was fairly submitted to the jury for their decision. The court, in the discharge of its duties in the case, could do no less; and, after considering again the charge given to the jury as a whole, as well as the particular part to which exception was taken, I am unable to find that the plaintiff has ground to complain of error or unfairness in the manner in which the case was submitted to the jury.

The court did not comment upon the evidence except to state that certain facts in the case were shown by uncontradicted evidence, and in this the plaintiff could not have been prejudiced, because the uncontroverted facts thus referred to by the court are, in the main, facts alleged by the plaintiff as part of the foundation of his case.   Complaint is made that the court drew an inference that the plaintiff discovered gas at his working place a short time before the accident, which is contrary to his testimony, and that there was no evidence for the jury to consider tending to prove that he had made such discovery.   It is a sufficient answer to this to say that I have already shown that the plaintiff testified to the fact of his having told Lowrey that he was getting gas, just a few minutes before the accident; and when the trial commenced his statement of his case in the complaint then on file alleged that he had made the discovery, and had reported it to Lowrey; and the amendment made during the trial is merely an ingenious attempt to fasten upon the defendant the responsibility consequent upon having received from the plaintiff notice of the fact that gas was accumulating in the mine, without at the same time convicting himself of the folly of voluntarily and unnecessarily igniting a match in the gas with knowledge of its presence.   It is the duty of a court, in giving its instructions to the jury, to make plain to them the questions which they are to decide, and to lay down the rules which must govern them in making their decisions as to the facts, and to inform them that it is the province of the jury to decide all disputed questions of fact; and, the court having done so, a party has no right to complain, even if the court does, in a fair and impartial manner, make comments upon the testimony for the purpose of assisting the jury in reaching a just conclusion.   This rule has been repeatedly affirmed and reiterated in the decisions of the supreme court of the United States and in the circuit court of appeals for the Ninth circuit.   The provision in the constitution of the state of Washington which provides that "judges shall not charge juries with respect to matters or fact, nor comment thereon, but shall declare the law" (article 4, § 16), is not applicable as a rule of practice in this court.

Upon a general view of the whole case it is my opinion that the verdict rendered by the jury is a correct conclusion as to the legal rights involved. Just how the accident occurred may never be known. It is difficult to reconcile the plaintiff's version with some of the proved circumstances, but it is equally difficult to reconcile the incontestable facts with any other theory which I have heard advanced; so we may adopt the plaintiff's statement as being probably true, or at least as plausible as any statement which may be made up from the testimony. His simple story, briefly told, is this: He was engaged in driving a chute upwards from a crosscut in the mine. He made a drill hole in the coal preparatory to putting in a charge of dynamite for blasting. When the hole was ready, he went down to the crosscut to obtain powder and fuse for the blast. While on this errand he met Lowrey, the fire boss, and told him there was not sufficient ventilation at his working place, that "we got more gas down there," and requested him to close an opening so as to force a stronger current of air in his direction. He returned immediately to his working place, and first made an examination with his safety lamp to ascertain if there was gas there, and found that the place was clear of gas. He then made up his cartridges, and put the same in the drill hole, put in a stick of giant powder with cap, and arranged his fuse, and tamped the filling. He then removed his tools to the crosscut, and returned, and lit a match for the purpose of firing the fuse, when the explosion occurred which injured him, as he claims, by setting fire to gas which had accumulated in a sufficient quantity to be combustible. The time intervening from his interview with the fire boss until the explosion occurred was altogether about 15 minutes. According to his own statement, it is plain that, if there was gas in the mine in a sufficient quantity to take fire from a lighted match, its presence would have been revealed to him before he lit the match, if he had observed his safety lamp. If the gas was there, and he was unaware of it, his ignorance was certainly due to his failure to observe his safety lamp. For him to light a match in a place where he knew that gas was liable at any time to come out of crevices and pockets in the coal—as he admits by his testimony that he did know—without observing his safety lamp, was a thoughtless and negligent act, which I can only compare to the act of a thoughtless person throwing a lighted match or a stump of a cigar into a keg of gunpowder. If this story of the plaintiff is true, there was no failure on the part of the defendant company to furnish a sufficient current of air in the chute where he was working to remove standing gas and smoke, and the injury to plaintiff was not in consequence of negligence on the part of the defendant in permitting gas to accumulate and remain at his working place. He shows affirmatively by his own testimony that within a period of less than 15 minutes before the explosion the place was clear of gas, and it is a necessary conclusion from his testimony that, if a gas explosion did occur, it was by reason of a quantity of gas coming out of the coal suddenly. Such an occurrence could not be prevented, and the plaintiff's misfortune must be regarded as the result of exposure to a danger necessarily incident to his employment as a coal miner, and for which his employer is not legally liable to respond in damages.